IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Stephanie Marie Cowin, ) | |
| ) | Civil Action No. 6:15-3625-TMC-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Carolyn W. Colvin, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on November 27, 2012, alleging she became unable to work on November 5, 2010. Both claims were denied initially and on reconsideration by the Social Security Administration. On September 4, 2013, the plaintiff requested a hearing. The ALJ, before whom the plaintiff and Lavonne Brent, an impartial

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

vocational expert, appeared on February 5, 2015, considered the case *de novo*, and on March 27, 2015, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.    The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on July 9, 2015.  The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

(2)    The claimant has not engaged in substantial gainful activity since November 5, 2010, the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).

(3)    The claimant has the following severe impairments: degenerative disc disease of the lumbar and cervical spine (20 C.F.R. § 404.1520(c) and 416.920(c).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

(5)    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) with additional limits.  In particular, the claimant can lift or carry up to 20 pounds occasionally and 10 pounds frequently.  She can stand or walk for approximately 6 hours of an 8-hour work day and sit for approximately 6 hours of an 8-hour work day with normal breaks.  The claimant, however, needs to alternate sitting or standing positions at thirty-minute intervals throughout the day without leaving the workstation.  The claimant is further limited to no foot control operation with the left leg, no more than occasional climbing of ramps or stairs, no climbing of ladders, ropes, or scaffolds, no more than occasional balancing, stooping, kneeling, or crouching, and no crawling.  The claimant must also avoid concentrated exposure to vibration, hazardous machinery, and unprotected heights, while also avoiding uneven terrain.

2

(6)    The claimant is capable of performing past relevant work as the following:  (1)  cashier II (*DOT* section 211.462-010), which was unskilled work with an SVP code of two, performed at the light exertional level; and (2)  pre-press operator (*DOT* section 972.381-034), which was skilled work, with an SVP code of five, performed at the light exertional level.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965).

(7)    The claimant has not been under a disability, as defined in the Social Security Act, from November 5, 2010, through the date of this decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing

3

substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance.  If there is evidence to justify a refusal to direct
a  verdict were the case before a jury, then there is "substantial
evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

On May 14, 2009, J. Allan Goodrich, M.D., saw the plaintiff for complaints of back pain.  She had good strength in her hips, knee, iliopsoas, and quads, but had give away weakness in ankle dorsi flexors.  Dr. Goodrich was "not sure that this really represents true motor weakness."  She could stand on her toes and heels without any difficulty, and her reflexes were symmetrical.  The plaintiff's studies showed some disc protrusion, and mild foraminal compression at L5, without significant compression at L4-5, although it did not correlate very well with her exam.  Dr. Goodrich believed her condition "can be managed quite adequately with medications" and did not recommend operative treatment. He referred the plaintiff to Mark J. Stewart, M.D., Augusta Back Neuroscience, for epidural steroid injections (Tr. 362-65).

On June 11, 2009, the plaintiff was treated by Dr. Stewart for complaints of back pain radiating to her right leg (Tr. 486).  On examination, the plaintiff had an antalgic gait with left sided limp; 4/5 muscle strength in the right and left leg; point tenderness to the lumbar paravertebral muscle groups and pain to palpation of the right sacroiliac joint and right greater trochanteric bursa; a positive right Faber's test; and a positive straight leg test on the right, although the notes did not reveal if it was in the sitting or supine position or both (Tr. 486, 490).  Her sensation was normal, she had 2+ pulses, and negative Patrick's and Spurling's tests (Tr. 490).  Diagnostic studies revealed a disc protrusion at L4-5 and

5

L5-S1 with mild neuroforaminal stenosis at L5-S1 (Tr. 488).  The plaintiff was scheduled for an epidural steroid injection (Tr. 486).

The plaintiff returned on June 30, 2009, following the injection, which gave her a "significant" reduction in her pain.  Overall, she was doing quite well.  She underwent another trigger point injection that day, reducing her pain by 75%.  Dr. Stewart discussed tapering the plaintiff's opioid pain medication to decrease her reliance on it (Tr. 492).

On September 10, 2009, the plaintiff reported low back pain with no complaints of numbness or weakness to physician's assistant Richard J. Leggett.  She had 4/5 muscle strength in her left leg, an antalgic gait, and limited range of motion in her lumbosacral spine, but normal sensation and deep tendon reflexes.  Her medications were refilled (Tr. 493).

On November 12, 2009, the plaintiff followed up for complaints of low back and neck pain with no associated numbness or weakness.  She had pain to palpation and decreased range of motion in the neck; an antalgic gait; and limited range of motion in the lumbosacral spine; but deep tendon reflexes and sensation were normal, and her straight leg raise was negative.  She received trigger point injections (Tr. 394).

On January 14, 2010, the plaintiff had pain and reduced range of motion in her neck and lumbosacral spine.  Her gait was antalgic with a left-sided limp.  On March 12, 2010, the plaintiff returned with decreased range of motion and pain.  Her gait was slightly antalgic.  She also had tenderness to palpation of the lower trapezius musculature between the scapula.  Her medications included Ambien, hydrocodone, gabapentin, oxycodone, and Flexeril (Tr. 395-96).

The plaintiff was seen at the Aiken Regional Medical Center Emergency Room on April 6, 2010, for ear pain, at which time she had a normal musculoskeletal examination of the upper and lower extremities, normal strength, normal sensation, and normal gait (Tr. 388).

On September 13, 2010, the plaintiff returned with pain and decreased range of motion in the neck, thoracic spine, and lumbosacral spine. She had an antalgic gait (Tr. 397).

On October 23, 2010, the plaintiff was seen at the University Health Care System Emergency Room for complaints of back pain going down both legs. She had "[n]o trouble walking," walked slowly but steadily, denied radicular numbness or tingling, and had no lower extremity weakness. On examination, she had no lower extremity weakness or sensory findings, normal muscle strength and tone, equal and symmetrical reflexes, no local bony tenderness, adequate range of motion, no significant deformity of the lower back, but right and left paravertebral spasm. She was discharged with medication (Tr. 368-73).

On November 1, 2010, the plaintiff received a trigger point injection of the bilateral thoracic paraspinous musculature. She exhibited pain and reduced range of motion in the neck, thoracic spine, and lumbosacral spine. The plaintiff had a positive straight leg raise on the left. Her gait was antalgic with a left-sided limp (Tr. 398-99). On November 8, 2010, Dr. Stewart administered an epidural steroid injection on the left (Tr. 393). On December 2, 2010, the plaintiff reported that the injection had decreased her pain, but she still had decreased range of motion in her neck and lumbosacral spine. She had a positive straight leg raise test on the left, and her gait was antalgic (Tr. 400).

The plaintiff returned to the Aiken Regional Medical Center Emergency Room on February 8, 2011, with complaints of left knee pain and swelling. The plaintiff was in no acute distress, appeared well, had normal neck and back exam, was independent in her activities of daily living, and had full range of motion and no edema in her extremities (Tr. 374, 379).

The plaintiff was treated at Margaret J. Weston Community Health from February 8, 2011, to January 9, 2013, for various complaints, including knee and back pain. Despite complaints of back pain, she denied lower extremity weakness or new radiculopathy symptoms. She had back tenderness on palpation with muscle spasm, and she walked with a limp, but her sensory exam was normal, and her motor exam showed no

dysfunction. She was treated with steroids, told to apply heat, and to perform daily stretches (Tr. 420-25).

The plaintiff followed up every few months with P.A. Leggett from April 2011 to October 2012 (Tr. 401-14). She complained of neck pain, knee pain, shoulder pain, and back pain, now radiating to her left leg (Tr. 401-09). She reported no associated numbness or weakness (Tr. 402-03). Upon examination, she had pain to palpation of the cervical paraspinous musculature; decreased range of motion in the neck, lumbosacral spine, and left knee; positive lumbosacral and cervical facet loading with pain on forward flexion; and an antalgic gait, although she had normal deep tendon reflexes and normal sensation (Tr. 401-09, 412). Her motor strength ranged from 4/5 (slightly diminished) to 5/5 (full) (Tr. 401-09, 412, 414). She had positive straight leg raising tests through December 2011 and in September 2012 (Tr. 401-405, 412), but in February, April, June, and August 2012, her straight leg raising tests were negative (Tr. 406-09). Her medications were refilled (Tr. 401-09).

On June 29, 2011, Lindsey Crumlin, M.D., a state agency consultant, reviewed the record and completed a residual functional capacity ("RFC) assessment (Tr. 96, 106). She opined that the plaintiff could lift and/or carry 20 pounds occasionally and ten pounds frequently; could sit and stand/walk for six hours each in an eight-hour workday; could frequently push/pull with her left lower extremity; and could frequently climb ladders/ropes/scaffolds, stoop, kneel, crouch; and crawl (Tr. 97-99, 107-09).

On September 27, 2012, the plaintiff indicated that her problem was worsening. Her pain radiated to her right foot. She was anxious and in moderate distress due to pain. She had positive straight leg raise tests on the right, both elevated and supine. She had an antalgic gait. A lumbar MRI was ordered (Tr. 412-13).

In October 2012, the plaintiff presented in a wheelchair. Dr. Stewart suggested an appointment for surgical evaluation, although there is no indication she underwent one. She was tearful and had pain, decreased range of motion, positive straight leg raise tests, and decreased motor strength throughout. Her gait was antalgic. Dr.

Stewart also reviewed the plaintiff's lumbar MRI (Tr. 414), which showed normal vertebral height and anatomic alignment and the upper three discs were relatively unremarkable for her age. At L4-5, there was disc desiccation and narrowing with mild spondylitic changes and a small central protrusion, but did "not result in significant stenosis or nerve root impingement." At L5-S1, there was disc desiccation and narrowing with a right paracentral and lateral recess protrusion, which could conceivably result in right S1 radiculopathy. The conus medullaris was in normal position and caliber, and the exit foramina were patent. The plaintiff was diagnosed with lower lumbar degenerative disc desiccation and spondylosis at L4-5 and L5-S1 (Tr. 391-92).

The plaintiff returned on December 17, 2012, for complaints of low back pain radiating to the right leg, left knee pain, and bilateral shoulder pain. On examination, she had decreased range of motion in the neck and lumbosacral spine and diminished sensation in the right S1 distribution, but her deep tendon reflexes were normal. She had a positive straight leg raising test on the left, but notes do not indicate if it was in the sitting or supine position, or both. Motor strength was 4/5 to 5/5 throughout. Although she presented in a wheelchair, she walked with an antalgic gait. She was advised to make an appointment for surgical evaluation (Tr. 427).

On February 4, 2013, the plaintiff complained of hip pain, low back pain, and right leg pain that radiated to her ankle (Tr. 429, 437). In April, she reported that her symptoms were severe but fairly controlled (Tr. 437). She had focal weakness, gait disturbance, back pain, bone/joint symptoms, and muscle weakness in the right lower extremity (Tr. 438-39).

On April 27, 2013, the plaintiff underwent a consultative examination with Stephen A. Schacher, M.D. (Tr. 431-37). She reported that she could stand for 10 minutes before sitting, stayed in bed most of the day, and could not sit comfortably (Tr. 431). She stated that she could not drive anymore (Tr. 431-32). The plaintiff indicated that she had two epidural steroid injections without relief (Tr. 431). However, she reported that she could dress and groom, but needed assistance with shoes and socks (Tr. 432). The plaintiff

9

noted that her roommate got the groceries, and she could not cook, wash dishes, do laundry, sweep, mop, or vacuum, although she folded laundry (Tr. 432).

On examination, the plaintiff could not get on the examination table and sat with her right leg propped up. Her gait was abnormal, and she walked with a limp. Range of motion testing was normal in the cervical spine, shoulder, elbow, wrist, hip, hand, and ankle, but reduced in the cervical spine and knee. The plaintiff's straight leg raising test in the supine position was positive, but Dr. Schacher could not perform an examination in the sitting position because the plaintiff could not lie flat. The plaintiff could tandem walk, but could not heel-toe walk or squat. When asked if the plaintiff used an ambulation assistive device, Dr. Schacher indicated, "no but needs one." He did not provide further findings relating to the need for an assistive device. The plaintiff had muscle weakness 4/5 in the right leg, but no sensory loss, joint abnormality, or atrophy (Tr. 432-35).

On May 2, 2013, Cleve Hutson, M.D., a state agency consultant, opined that the plaintiff could occasionally lift and/or carry 20 pounds and frequently lift and/or carry ten pounds. She could stand and walk four hours and sit for six hours. She was limited to occasional use of the right lower extremity due to lower back pain that radiated to the right lower extremity. She could occasionally climb ramps and stairs, kneel, crouch, and crawl. She could frequently stoop and never climb ladders, ropes, and scaffolds. The plaintiff was limited in bilateral reaching overhead due to neck pain. She should avoid concentrated exposure to hazards (Tr. 120-22).

At a June 2013 appointment at Augusta Back Neuroscience, the plaintiff reported no changes in her sciatica since her last visit (Tr. 443).

On August 3, 2013, the plaintiff underwent a consultative examination with Branham Tomarchio, M.D. The plaintiff indicated that she has chronic back pain, but when asked where her pain was, she was not able to give a precise location. She reported that she only tried treatment with exercise for her lower back pain. The plaintiff stated that she needs help dressing herself; can walk for five minutes at one time; can only lift five pounds; and cannot drive. She reported that she does not sweep, mop, vacuum, cook, wash

dishes, shop, go upstairs, or mow the grass (Tr. 448). The plaintiff was considered "somewhat reliable" (Tr. 447-52).

The plaintiff entered the office being pushed in a wheelchair, but was able to stand next to her wheelchair to perform visual acuity testing. She was able to move to the examination table, but stated her right leg was weak. Upon examination, the plaintiff's extremities had 2+ pulses without any evidence of edema, cyanosis, or clubbing. Her joints showed no evidence of redness, swelling, or effusion. Her grip strength was 5/5 and she appeared to have normal fine and gross manipulation. The range of motion in her cervical spine, shoulder, elbow, wrist, hip, and ankle were normal. Her lumbar spine flexion was 45 degrees, and she had normal extension and lateral flexion. She had no evidence of deformity in the spine and was nontender to palpation. She reported pain at 45 degrees of flexion on the left knee, but her range of motion was otherwise normal. Her motor strength was 5/5 in the upper and lower extremities, except 3/5 distal and proximal muscle strength in the right lower extremity. Sensation was intact throughout. The plaintiff stated that she was unable to walk on her toes, heels, perform tandem walking, or squat. She "would not walk." Straight leg raising tests were positive in the supine position, but normal when sitting. Dr. Tomarchio noted that "if her presentation is genuine," he believed she would have difficulty standing for prolonged periods, walking long distances, or lifting or carrying heavy objects (Tr. 448-50).

From August 20 to 21, 2013, the Cooperative Disability Investigations Unit ("CDIU") investigated the plaintiff's allegations of disability following her presentation in a wheelchair at two consultative examinations. On August 20, 2013, the CDIU went to the plaintiff's residence and observed no handicap ramp at the front or rear doors. Several blocks from the plaintiff's address, the CDIU observed a vehicle registered in the plaintiff's name in the parking lot of Walgreens. They observed the plaintiff walk out of Walgreens carrying two bags of items and a large purse. Although the plaintiff walked with a limp, she did not use a cane or wheelchair. The plaintiff was observed driving for 2.6 miles while smoking a cigarette. The CDIU documented observations by video (Tr. 455-56).

11

The plaintiff later returned to Walgreens carrying a plastic bag and attempted to return a 12 pack of beer, weighing approximately nine pounds. The plaintiff walked to the back of the store to get lice products and two packs of cigarettes. The plaintiff took the cigarettes and was able to bend at the waist to put the beer on the floor. The plaintiff completed her transaction and walked with a slight limp to her car. She did not use a cane or wheelchair, although Walgreens has one available for customers. The plaintiff was able to hold and carry packages, complete transactions, and carry a large purse (Tr. 457).

An interview with Walgreens' staff revealed that the plaintiff was a regular customer and came in by herself or with others. They stated that the plaintiff was able to walk through the store "fine" (although with a "swagger"), never used a cane, and used a wheelchair only once. Another witness reported she came in to the store once per month; walked with a limp; never used a wheelchair; and never used a cane (Tr. 457-58).

On August 21, 2013, Rebecca Meriwether, M.D., a state agency medical consultant, reviewed the record and completed an RFC assessment (Tr. 147-50, 161-64). Dr. Meriwether opined that the plaintiff could lift and/or carry 20 pounds occasionally and ten pounds frequently; could sit and stand/walk for six hours each in an eight-hour workday; with unlimited push/pull abilities; could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders/ropes/scaffolds; and should avoid concentrated exposure to hazards (machinery, heights, etc.) (Tr. 147-50, 161-64). Dr. Meriwether noted that the plaintiff's presentation at various appointments varied considerably and that observations made during the CDIU report showed that she was capable of sustaining independent ambulation and exertion (Tr. 150, 164). She noted that the CDIU report was evidence of significant exaggeration of the severity of her impairments (*id*.).

On February 4, 2014, the plaintiff presented at Southside Family Medicine to establish a primary care provider. She saw Roland Saavedra, M.D. She complained of decreased grip strength in her hands and changes in her hearing at Southside Family Medicine. She reported pain in her back, and right knee, as well as weakness in her hands

12

and loss of grip strength.  The plaintiff had a lack of sleep and loss of energy.  She was diagnosed with chronic pain, insomnia, depression, reactive airway disease and hyperglycemia (Tr. 459).

On February 25, 2014, Dr. Stewart noted that the plaintiff reported gait disturbance, headaches, insomnia, back pain and bone/joint symptoms, which were poorly controlled (Tr. 469-70).

The plaintiff returned to Southside Family Medicine on April 8, 2014, with chronic neck pain and associated hand numbness.  Examination revealed no stiffness, pain, tenderness, or masses in neck.  She had mild tenderness in her cervical spine, but no swelling.  She was generally healthy with no change in strength or exercise tolerance.  Dr. Saavedra recommended a cervical spine x-ray, Flexeril, and a heating pad (Tr. 463).  On April 21, 2014, the plaintiff had gait disturbance, headaches, insomnia, back pain, bone/joint symptoms and muscle weakness in her upper extremities.  She was in moderate distress due to pain.  She had decreased sensation in the right L4, L5 distribution.  She had an antalgic gait.  Her medications included Ambien, Celebrex, Chantix, duragesic patches, Flexeril, and oxycodone (Tr. 474-76).

On June 20, 2014, Dr. Stewart noted the plaintiff's insomnia, gait disturbance, headaches, back pain, bone/joint symptoms, and muscle weakness in her upper and lower extremities (Tr. 478).

On August 21, 2014, examination revealed an antalgic gait, mild pain with motion of the cervical spine, moderate pain with motion of the lumbar spine, tenderness to palpation of the lumbar spine, decreased sensation in the L4 and L5 distribution, but normal motor function and deep tendon reflexes.  She had paravertebral spasms in the lumbosacral area.  Her sensation was decreased in the a right L4, L5 distributions (Tr. 482-83).

The plaintiff followed up on December 3, 2014, reporting severe pain.  A review of the plaintiff's symptoms was positive for back pain, neck pain and stiffness, and a gait problem, but negative for joint swelling. The plaintiff also reported tingling, weakness,

and headaches. Examination showed normal reflexes and no sensory deficit, although decreased range of motion, tenderness, and pain in the back. Her medication was refilled (Tr. 500-503).

The plaintiff testified at the administrative hearing that Flexeril and the Duragesic patch made her drowsy, so she used those medications at night. She testified that she stopped working because of pain in her back and legs. The plaintiff mentioned that a physician's assistant suggested that surgery might help with her sciatic nerve problem (Tr. 59-60). She did not have insurance or financial resources to have surgery. She used heating pads and ice packs. Her pain was worst in her lower back and in her neck. She did not know if her leg pain was related to her back, but she had pain in both sides of her legs in the thigh area. The pain occurred mostly in the mornings, about six times a week, and lasted about 20 or 30 minutes. On a good day, she gets up, walks around, washes clothes, makes something to eat, and goes outside, although on a bad day she stays still (Tr. 62). Lying down on her left side was the most comfortable position for her (Tr. 58-63). The plaintiff testified that on a really bad day, she uses a wheelchair; but on other days she may only use a cane, and, on some days she does not even need a cane (Tr. 64, 339). The plaintiff reported that a doctor did not prescribe the cane (Tr. 93, 103). She stated on a good day she can stand or walk for about 15 or 20 minutes at a time and can sit for about 20 minutes before needing to change positions (Tr. 66-67).

The plaintiff testified that she was taking medication for depression. She was depressed due to not being able to go places like she wanted to because of her back and neck. The plaintiff gave an example of not being able to go to her granddaughter's school for an event. She reported that on a bad day she would lie in bed. On a good day, she tried to straighten up her room or wash clothes. Generally, the plaintiff stayed home. She left to go to the doctor or to run a quick errand. When the plaintiff did the laundry she had to do one load and then wait a couple of hours before she could do another load. She only washed five or six items at a time (Tr. 68-71).

The plaintiff reported that her leg had given out on her and she had fallen. For that reason she walked slowly and tried to keep her balance. The plaintiff stated that she read well enough to read the newspaper and understand. Her daughter helped her with her Social Security forms. The plaintiff said she would love to be able to have surgery and go back to work. She had worked since she was 16 or 17 years old, and she missed working (Tr. 71-73).

The ALJ asked the plaintiff if she completed her function report for Social Security. The plaintiff said she was able to complete the form, but her daughter sat with her and helped her. The plaintiff had a driver's license and drove a couple of times a week to places like Dollar General and the doctor's office. She stayed at Dollar General for about ten to 15 minutes. She cooked twice a week. Her daughter did most of the cooking, and her granddaughter did the dishes. Her daughter mostly did the grocery shopping. She went shopping with her daughter a month prior to her hearing, but she sat at the Starbucks while her daughter shopped. The plaintiff said that the heaviest thing she had lifted recently was a container of liquid laundry detergent. She could not lift her grandson, who weighed 22 pounds. She did not babysit because she did not want an accident to happen (Tr. 74-78).

She testified that she has no trouble with personal care; cooks twice per week; can lift a bottle of liquid laundry detergent; does crochet and needlepoint; made Valentine hearts with her grandchildren and Christmas crafts; and watches television (Tr. 76-77, 79-80; 340). Last spring, she went to Florida to visit her father after her mother passed (Tr. 80). She goes to church every Sunday morning, although has not attended in the past two months due to pain (Tr. 80-81). The plaintiff's brother and sister visited her in her home. On a good day she walked to the side yard to get outside and stretch her legs (Tr. 78-82).

The attorney asked the plaintiff about an investigative report that stated that she was seen limping, with and without a cane, and sometimes in a wheelchair and sometimes not. The plaintiff explained that she had a need for a wheelchair if she was having a really bad day. Some days she might need the cane to go into a drugstore and

some days she did not.  Her need for a cane was based on how far she would have to walk. She could walk about 200 feet, but if she had to walk 200 yards she would need the cane. The plaintiff estimated that she could stand or walk for about 15 or 20 minutes at a time. She had problems sitting also.  She said she was uncomfortable, and she kept her knee straight and out to the side instead of bent and underneath her chair.  The plaintiff said she could sit for about 20 minutes.  Her left knee did not bend in order to sit correctly.  She could lift and carry about ten pounds.  If she lifted something too heavy, she had pain shooting down her back.  The plaintiff also had problems in her arms and hands, which started about four months prior to the hearing.  Her hands swelled and went numb.  She had shooting pain down the inside of her arm.  The plaintiff did not have the money to get an MRI of her neck (Tr. 63-68).

The plaintiff also reported to the Agency in claims communications that she does her own grocery shopping, has a driver's license and drives; washes her own clothes; vacuums; washes dishes; and sweeps; although she later reported that she does not drive (Tr. 93, 103, 327, 340).  She also reported that she prepares her own meals and does all of her housework, although she does chores in moderation (Tr. 93, 326).  The plaintiff reported that she can walk for ten to 15 minutes before sitting for ten to 15 minutes, although she stated she could walk only 12 feet without stopping to rest (Tr. 93, 103, 329). The plaintiff indicated that she can rise from a seated position without assistance and can walk on even surfaces, but needs assistance on uneven surfaces (Tr. 93, 103).  She uses ice, heat, and Epsom salts; and her medication helps with her back pain (*id*.).

A vocational expert also testified at the administrative hearing and described the plaintiff's past work as that of a Cashier and Prepress Operator.  The ALJ provided the vocational expert with a hypothetical question, where an individual the plaintiff's age, education, and vocational experience could perform light work; could never use foot controls in the left lower extremity; could occasionally climb ramps and stairs, balance, stoop, kneel, and crouch; never climb ladders, ropes, or scaffolds, or crawl; must avoid concentrated exposure to vibration, hazardous machinery, and unprotected heights; and

avoid uneven terrain.  The vocational expert testified that the individual could perform the plaintiff's past work as a Cashier, as generally and actually performed, and as a Prepress Operator, as generally performed (Tr. 83-84).  The ALJ asked the vocational expert to further assume that the individual requires the ability to alternate between sitting and standing at approximately 30-minute intervals throughout the workday without leaving the workstation or being off task (Tr. 84-85).  The vocational expert testified that the plaintiff's past work as a Cashier, as actually and generally performed, remained, however the Prepress Operator job would be eliminated (Tr. 85).  Other jobs that the individual could perform included Assembler, *Dictionary of Occupational Titles* ("*DOT*") No. 706.684-022, light, SVP of 2, with 235,910 jobs nationally and 2,320 jobs regionally, and Ticket Taker, *DOT* No. 344.667-010, light, SVP of 2, with 105,560 jobs nationally and 2,550 jobs regionally (Tr. 84-85).

The ALJ proposed a third hypothetical:  "Assume all of the same limitations as contained in hypothetical number two, with an additional limitation of eight to nine unexcused or unscheduled absences per month" (Tr. 85).  The vocational expert stated that the individual could not perform the plaintiff's past work or any other work.  The vocational expert testified that her testimony was consistent with the information in the *DOT*, with the exception of the sit/stand option and the absenteeism, which were based on her training and experiences.

The plaintiff's attorney asked the vocational expert questions about the hypotheticals presented.  The vocational expert stated that an individual who missed four or five days of work in a month would be unable to sustain full time work.  An individual with the limitations provided by the plaintiff during the hearing, including standing and sitting for only 20 minutes at a time, an inability to sit in a normal sitting position, the need for a cane and, on some days, a wheelchair, would not be able to perform competitive work on a full time basis (Tr. 85-87).

17

The ALJ proposed a fourth hypothetical, which was the same as the second hypothetical, but reduced to the sedentary level (Tr. 87-88). The vocational expert stated that the fourth hypothetical individual could not perform the plaintiff's relevant work. The individual could work as a Table Worker, *DOT* No. 739.687-182, sedentary, SVP of 2, with 434,170 jobs nationally and 11,170 jobs regionally; Surveillance System Monitor, *DOT* No. 379.367-010, sedentary, SVP of 2, with 74,470 jobs nationally and 1,150 jobs regionally; and Final Assembler, *DOT* No. 713.687-018, SVP of 2, sedentary, with 235,910 jobs nationally and 2,320 jobs regionally (Tr. 87-89).

Following the February 2015 hearing, the plaintiff submitted an application dated March 5, 2015, and signed by physician's assistant Leggett for a disability placard on her vehicle to use "as needed." The form indicated that her disability was permanent (Tr. 506-507).

## ANALYSIS

The plaintiff was 42 years old on her alleged disability onset date (November 5, 2010) and 46 years old on the date of the ALJ's decision (March 27, 2015) (Tr. 111). She completed her education through the eighth grade (Tr. 277). The plaintiff has past relevant work as a cashier and as a pre-press operator (Tr. 32, 278).

The plaintiff argues that the ALJ erred by (1) failing to properly evaluate whether her impairments meet or equal the criteria of Listing 1.04; (2) failing to properly evaluate her credibility; (3) failing to properly assess her RFC; and (4) failing to properly consider the consultative opinions.

### Listing 1.04

The plaintiff argues that the ALJ erred in failing to properly evaluate whether her impairments meet and/or equal the criteria of Listing 1.04(A) (Disorders of the spine). *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04. The plaintiff bears the burden for proving a presumptively disabling impairment under the listings. *Bowen v. Yuckert*, 482 U.S. 137

18

146 n.5 (1987). Under Listing 1.04(A)[2], the plaintiff must establish that she meets the following criteria:

> *Disorders of the spine* (e.g., herniated nucleus pulposes, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.
>
> With:
>
>> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).
>>
>> ***

20 C.F.R. pt. 404, subpt. P, app.1, § 1.04(A).

At step three of the sequential evaluation process, the ALJ stated in pertinent part:

> Although the claimant has "severe impairments," they do not met the criteria of any listed impairments described in Appendix 1 of the Regulations (20 C.F.R., Subpart P, Appendix 1). No treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment. In making this finding, the undersigned considered all applicable impairments listings; however, the evidence fails to show that the claimant's approach listing level severity. . . .

(Tr. 24).

---

[2]Listing 1.04 contains three subsections, but only the subsection A paragraph is addressed by the plaintiff in her argument (doc. 17 at 28-31).

The plaintiff asserts that the ALJ did "not consider" Listing 1.04[3] (doc. 17 at 28-31 (citing *Cook v. Heckler*, 783 F.2d 1168 (4th Cir. 1986)).  However, an exhaustive analysis under Listing 1.04 was unnecessary here due to the dearth of evidence supporting a listings-level impairment.  Importantly, the ALJ specifically found in the RFC assessment that the plaintiff's diagnostic studies showed "no significant nerve root impingement" (Tr. 30) and only "some" positive straight leg raising tests (Tr. 27).  Moreover, as argued by the Commissioner, the Fourth Circuit's recent decisions to remand listing-issue cases to the Commissioner are likewise distinguishable.  In those cases, the Fourth Circuit ordered remand because the administrative record presented conflicting evidence with respect to the listing's criteria, and the ALJ's failure to resolve the conflicts precluded meaningful review. *Brown v. Colvin*, C.A. No. 14-2106, 2016 WL 502918, at *2 (4th Cir. 2016) (remanding because the record "is not so one-sided that one could clearly decide, without analysis, that [a listing] is not implicated"); *Fox v. Colvin*, C.A. No. 14-2237, 2015 WL 9204287, at *5 (4th Cir. 2015) (remanding where "[i]nconsistent evidence abounds"); *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) (remanding where the "there [was] probative evidence strongly suggesting that [the claimant] meets or equals Listing 1.04A").  By contrast, in this case, as discussed below, there is no unresolved conflict of evidence that forecloses meaningful review.

The plaintiff has failed to prove that she had a disorder of the spine resulting in the compromise of a nerve root or spinal cord, with evidence of nerve root compression as required by Listing 1.04(A).  The ALJ recognized in the RFC analysis that diagnostic imaging did not support this criterion (Tr. 30), noting that the plaintiff's May 2009 x-ray

---

[3]The ALJ gave the opinions of the state agency physicians "partial evidentiary weight" to the extent they found the plaintiff was limited to a light exertional capacity, but the ALJ found that the plaintiff had additional postural and environmental limitations not found by these physicians (Tr. 31-32).  The state agency physicians specifically considered Listing 1.04 (Tr. 119, 146).

showed some disc protrusion and mild foraminal compression at L5-S1, without significant compression at L4-L5 (Tr. 27, 30 (citing Tr. 362)).  The ALJ also noted the plaintiff's October 2012 MRI, which showed disc desiccation with "mild" spondylitic changes and a small central protrusion, narrowing with a right paracentral and lateral recess protrusion, but "does not result in significant stenosis or nerve root impingement" (Tr. 28, 30 (citing Tr. 391)). *See Segar v. Colvin*, C.A. No. 5:13-cv-1038- DCN, 2014 WL 7148720, at *3, 7 (D.S.C. Dec. 15, 2014) (ALJ's finding that claimant did not meet Listing 1.04 based on substantial evidence where MRI showed mild disc bulges with "[n]o severe stenosis or neural impingement"); *Owens v.Astrue*, C.A. No. 9:11-cv-0100-BM, 2011 WL 5869809, at *5 (D.S.C. Nov. 21, 2011) (where MRI did not reveal any significant herniation, stenosis, or nerve root impingement, ALJ properly found that claimant did not meet Listing 1.04).

Additionally, although the plaintiff cites to positive straight-leg raising tests, the plaintiff cannot satisfy Listing 1.04(A) because it is not clear whether these tests were from the sitting or supine position, or both. *See Parker v. Colvin*, C.A. No. 3:14-cv-502, 2015 WL 5793695, at *14 (E.D. Va. Sept. 29, 2015) (finding claimant did not satisfy Listing 1.04(A)'s requirements and noting physician did not specify if straight leg raising tests were performed in both supine and sitting positions); *Fripp v. Colvin*, C.A. No. 9:14-cv-0310-MGL-BM, 2015 WL 3407569, at *4-5 (D.S.C. May 27, 2015) (plaintiff's failure to provide evidence of straight leg raising tests in both the sitting and supine positions was "alone fatal to his claim").  Here, as in the foregoing cases, it is unclear whether the positive straight leg raising tests by the plaintiff's treating physicians were in the sitting or supine positions, or both (doc. 17 at 19-20, 30 (citing Tr. 399-403, 412, 414, 427, 449)). Further, with regard to the consultative examinations, Dr. Schacher only performed a straight leg raising test in the supine position (Tr. 434), and Dr. Tomarchio found that while the plaintiff's straight leg raising test was positive in the supine position, it was negative in the seated position (Tr. 449).  Moreover, the evidence also shows that the plaintiff had a number of

21

negative straight leg raising tests (Tr. 394-97, 406-09). The plaintiff bears the burden of demonstrating all of the listed criteria, and she has failed to show evidence of positive straight leg raising tests in both the sitting and supine positions.

Based upon the foregoing, the undersigned finds that the ALJ's listing analysis is based upon substantial evidence and without legal error.

***Credibility***

The plaintiff also argues that the ALJ erred in the credibility determination (doc. 17 at 31-37). The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 594-95 (4th Cir. 1996) (citations and internal quotation marks omitted) (emphasis in original). In *Hines v. Barnhart*, a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d 559, 565 (4th Cir. 2006). However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or

sensory or motor disruption), if available should be obtained and considered.'" *Id*. at 564

(quoting SSR 90-1p, 1990 WL 300812).  The court further acknowledged:

> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658

(4th Cir. 2005); 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) ("We must always attempt to

obtain objective medical evidence and, when it is obtained, we will consider it in reaching

a conclusion as to whether you are disabled.  However, we will not reject your statements

about the intensity and persistence of your pain or other symptoms or about the effect your

symptoms have on your ability to work solely because the available objective medical

evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6

("[T]he absence of objective medical evidence supporting an individual's statements about

the intensity and persistence of pain or other symptoms is only one factor that the

adjudicator must consider in assessing an individual's credibility and must be considered

in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity

to work to the extent that alleged functional limitations are reasonably consistent with

objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).

Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as

long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's

credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight.*" Id.* The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

> (1) the individual's daily activities;
>
> (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> (3) factors that precipitate and aggravate the symptoms;
>
> (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id*. at *3. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

Here, the ALJ found that while the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible (Tr. 29). The ALJ first cited the controlling law and set out the plaintiff's alleged symptoms and limitations, including limitation to 200 yards of walking, 20 minutes of standing, 20 minutes of sitting, and ten pounds of lifting or carrying, give-away weakness

of left knee and right lower extremity, and occasional reliance on a cane or wheelchair for ambulation  (Tr. 28-29).  Then, the ALJ considered a "number of factors that indicate her condition did not rise to the level of severity that was alleged":  the plaintiff's daily activities, objective evidence of her impairments, the conservative treatment of her impairments, and medication side effects (Tr. 29-30).

First, the plaintiff specifically argues that the ALJ's summary of her daily activities is inconsistent with the evidence (doc. 17 at 33-36).  As set out above, the ALJ is expressly authorized by the regulations and the law of this circuit to consider a claimant's daily activities in the credibility assessment. 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i); *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994)).  The ALJ found that the plaintiff maintained the ability to perform numerous daily activities, including tending to personal care; preparing meals multiple times per week; doing laundry, vacuuming, and completing household chores, within reason; driving approximately twice per week; occasionally going to church; crocheting; shopping in stores, although sometimes with assistance; and periodically socializing with family and friends, including her daughter and two grandchildren with whom she resides (Tr. 29-30; *see* Tr. 75-81, 93, 103).  In her brief, the plaintiff notes that she cannot drive (doc. 17 at 34 (citing Tr. 431, 447-48).  However, at the hearing, the plaintiff testified that she drove approximately twice per week (Tr. 75), and the CDIU observed her driving to Walgreens on her own (Tr. 456-57).  To the extent the plaintiff presents conflicting evidence regarding her abilities (doc. 17 at 33-34), it is the responsibility of the ALJ, not this court, to resolve such conflicts. *Craig*, 76 F.3d at 589 (stating that the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]").  The ALJ appropriately did so here, and found the plaintiff's daily activities demonstrated a greater ability than alleged.

The ALJ also considered the plaintiff's diagnostic tests, which showed no significant nerve root impingement, in evaluating her credibility (Tr. 28, 30; *see* Tr. 362,

25

391). Here, where diagnostic testing in 2009 showed no more than some disc protrusion and "mild" foraminal compression at L5-S1, "without significant compression" at L4-L5 (Tr. 362), and repeat testing in 2012 showed only disc desiccation with "mild" spondylitic changes and a small central protrusion, narrowing with a right paracentral and lateral recess protrusion, but "does not result in significant stenosis or nerve root impingement (Tr. 391), the ALJ properly considered that the diagnostic testing did not support her subjective complaints as one factor in the analysis. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) (ALJ may considered objective evidence including clinical and laboratory diagnostic techniques in evaluating a claimant's symptoms, such as pain).

The ALJ also considered the conservative treatment of the plaintiff's back pain (Tr. 30). "[I]t is well established in the Fourth Circuit that it is appropriate for the ALJ to consider the conservative nature of the treatment that a plaintiff receives in making a credibility determination." *Gilbert v. Colvin*, C.A. No. 2:14-981-MGL-MGB, 2015 WL 5009225, at *5, 18 (D.S.C. Aug. 19, 2015) (citations omitted). *See Dunn v. Colvin*, 607 F. App'x 264, 275 (4th Cir. 2015) ("Because it is well established in this circuit that the ALJ can consider the conservative nature of a claimant's treatment in making a credibility determination . . . ."). Here, the ALJ noted that the plaintiff was treated only with medication (which was moderate in strength and nature) and occasional injections (Tr. 27-28, 30; *see* Tr. 351, 400, 492). *See Smith v. Colvin*, C.A. No. 2:14-3224-TMC, 2016 WL 943667, at *4 (D.S.C. Mar. 14, 2016) (pain medication and injections generally considered to be conservative). The ALJ noted that Dr. Goodrich stated that the plaintiff's condition could be managed quite adequately with medication (Tr. 27; *see* Tr. 362) and that ongoing pain management records from Dr. Stewart and Mr. Leggett also indicated that the plaintiff's condition was stable on conservative care and treatment (Tr. 28). The ALJ further noted that the plaintiff did not undertake any significant home remedies to manage her pain – she reported only the use of ice, heat, and Epsom salts (Tr. 30; *see* Tr. 93, 103). Moreover, the

26

ALJ noted that in April 2013 the plaintiff reported that her symptoms were "fairly controlled" and reported no changes in her status in June 2013 (Tr. 28; *see* Tr. 437, 440). As recognized by the ALJ, when the plaintiff had complied with treatment, her impairments were easily controlled (Tr. 30; *see* Tr. 93, 103 (pain medication helps with her back pain); 400 (injection decreased pain greater than 80%); 492 (injections gave "significant" reduction in pain, dropping pain by 75%; overall she was quite well)). Additionally, the record contains no evidence that the plaintiff required more aggressive treatment. While physician's assistant Mr. Leggett suggested that the plaintiff seek a surgery consultation, he did not conclude that surgery was necessary (Tr. 28; *see* Tr. 427). Further, as noted by the ALJ, there is no indication that the plaintiff followed through with this recommendation for a surgical consultation (Tr. 30). Also, despite claims that the plaintiff relied on a wheelchair on occasion, the ALJ properly discounted the plaintiff's credibility finding that such ambulatory aids were not medically necessary, noting that the plaintiff was observed to ambulate in public without her aids, despite occasionally using them (Tr. 30; *see* Tr. 456-57).

The undersigned finds no error in the ALJ's consideration of the above factors in assessing the plaintiff's credibility. Further, the undersigned finds the ALJ's credibility assessment was based upon substantial evidence.

### *RFC*

The plaintiff next argues that the ALJ erred in assessing her RFC (doc. 17 at 18-24). Social Security Ruling ("SSR") 96-8p provides in pertinent part:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraph (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional level of work, sedentary, light, medium, heavy and very heavy.

27

SSR 96-8p, 1996 WL 374184, at *1.  The ruling further provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at *7 (footnote omitted).  Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*  Moreover, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  *Id.*

Specifically, the plaintiff contends that the ALJ understated the examination findings in the record (doc. 17 at 19-20).  The undersigned finds that the ALJ properly considered both the positive and negative findings in reviewing the medical evidence (Tr. 27-28).

The ALJ acknowledged that "examination notes showed some antalgic gait and loss of range of motion at the lumbar spine, with occasional reliance on aids for ambulation" (Tr. 27).  The ALJ considered the treatment notes of Dr. Goodrich, who noted that the plaintiff was in moderate distress, but had good strength at the hips, knees, thighs, and quadriceps, and some give-away weakness at the ankles (Tr. 27; *see* Tr. 362).  The ALJ also discussed the plaintiff's x-rays and MRI findings (Tr. 27-28; *see* Tr.  362, 364, 391).  Notably, the ALJ recognized Dr. Goodrich's conclusion that the plaintiff's condition

28

could be managed quite adequately with medication (Tr. 27; *see* Tr. 362). The ALJ further reviewed the treatment notes of Dr. Stewart and physical therapist Mr. Leggett (Tr. 27-28), noting that the office visit notes from June 11, 2009, to October 19, 2012, did show a progression in positive findings (Tr. 27). For example, the ALJ noted (Tr. 27) that earlier treatment notes showed full strength (January, March, September, November, December 2010; April, June, August, October, December 2011; February 2012) (*see* Tr. 395-97, 399-406), while later records showed slightly diminished strength ranging from 4/5 to 5/5 (April, June, August, October, December 2012)[4] (Tr. 407-09, 414, 427). While the plaintiff notes that she had muscle weakness as significant as 3/5 (doc. 17 at 20 (citing Tr. 449)), this appears to have only been on one occasion in the distal and proximal muscle groups in her right lower extremity, and all other strength testing showed at most slightly diminished strength of 4/5 (Tr. 449). Further, the plaintiff's sensation was intact, with normal deep tendon reflexes, and she reported no weakness or numbness from June 2009 to October 2012 (Tr. 395-97, 399-409, 490, 493). Although she reported some diminished sensation in December 2012 and early 2014 (Tr. 427, 475, 483), the consultative examinations in 2013 found no sensory loss (Tr. 435, 449), and her most recent testing at Augusta Back Neuroscience in December 2014 revealed normal reflexes and no sensory deficit (Tr. 501). Based upon the foregoing, the ALJ's characterization of only "some" muscle weakness was accurate (Tr. 27).

The plaintiff contends that the ALJ erred in stating that the plaintiff's examinations showed "some positive straight leg raise testing" (doc. 17 at 19-20 (citing Tr. 27)). While the plaintiff initially had a positive straight leg raising test in June 2009 (Tr. 486), straight leg raising tests from November 2009 to September 2010 were negative (Tr. 394-97). Further, although the plaintiff had additional positive straight leg raising tests from

---

[4]The plaintiff also had 4/5 leg strength in June and September 2009 (Tr. 490, 493).

November 2010 to December 2011 and in September and December 2012 (Tr. 399-405, 412, 427), straight leg raising tests from February to August 2012 were negative (Tr. 406-09). The ALJ also noted the positive straight leg tests by consultative examiners Drs. Schacher and Tomarchio in April and August 2013 (Tr. 28; *see* Tr. 434, 449). Based upon the foregoing, the undersigned finds no error in the ALJ finding "some" positive straight leg raising tests where she noted both the positive and negative treatment notes.

The plaintiff further argues that the ALJ's characterization of "some" antalgic gait was inconsistent with the record (doc. 17 at 20-21 (citing Tr. 27)). Although treatment notes with Augusta Back Neuroscience revealed an antalgic gait (Tr. 394-97, 399-414, 427, 475, 486, 493), notes from the Aiken Regional Medical Center Emergency Room from April 2010 revealed a normal gait, normal musculoskeletal examination of the upper and lower extremities, normal strength, and normal sensation (Tr. 388), and notes from the University Health Care System Emergency Room dated October 2010 indicated that she had "[n]o trouble walking," no extremity weakness or sensory findings; normal strength and tone; and adequate range of motion (Tr. 368-69). Accordingly, the undersigned finds no error in the ALJ's statement that treatment notes revealed "some" antalgic gait (Tr. 27-28).

The plaintiff further argues that the ALJ erred in finding that she could perform the stooping required of light work because she had limited range of motion in her spine (doc. 17 at 22-23). However, the undersigned finds that the ALJ properly considered the plaintiff's range of motion limitations by restricting her to only "occasional" stooping (Tr. 26), defined as "from very little to up to one-third of the time." SSR 96-9p, 1996 WL 374185, at *8 (noting that a restriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work). This limitation is consistent with the opinion of state agency consultant Dr. Meriwether (Tr. 148, 162), who indicated that the plaintiff could occasionally stoop, and is more restrictive than the opinions of state agency consultants Drs. Crumlin and Hutson, who both opined that the plaintiff could frequently

stoop (Tr. 98, 108, 120, 132). The ALJ specifically found that the evidence warranted additional postural limitations beyond those opined by the state agency physicians (Tr. 31). Furthermore, as noted by the Commissioner (doc. 19 at 28), the *Dictionary of Occupational Titles* ("*DOT*") indicates that stooping is "not present" in the job of Cashier II, *DOT* No. 211.462-010, 1991 WL 671840, which the ALJ relied upon in finding that the plaintiff could perform her past work.[5] Accordingly, even if the ALJ erred in finding that the plaintiff could perform occasional stooping, any error was harmless. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir.1994) (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding).

The plaintiff further asserts that the ALJ erred by "omitting any discussion of the medical necessity of an assistive device" in her decision (doc. 17 at 21-22). However, the ALJ did specifically discuss this issue, finding that "[t]he claimant also notes occasional reliance on a cane or wheelchair; yet, the medical evidence of record fails to show that such

---

[5]Stooping is also "not present" in the job of Prepress Operator, *DOT* No. 972.381-034, 1991 WL 688546, which is the other past relevant work the ALJ found the plaintiff was capable of performing (Tr. 32). In the second hypothetical given to the vocational expert at the administrative hearing, the ALJ set forth the RFC finding that he adopted for the plaintiff, which included "the ability to alternate between sitting and standing positions at approximately 30-minute intervals throughout the day without leaving the work station or being off task" (Tr. 84-85; *see* Tr. 26). The vocational expert testified that the Prepress Operator position would be eliminated, but the hypothetical person could still perform the Cashier II position both as actually performed and as normally performed in the national economy (Tr. 85). In finding that the plaintiff could still perform her past relevant work as both a Prepress Operator and Cashier II at step four of the sequential evaluation process, the ALJ mistakenly stated that the vocational expert testified that the RFC finding did not preclude the plaintiff's past work in both of these positions (Tr. 32). The plaintiff has not raised this as an error. However, even if this issue was properly before the undersigned, this error would be harmless as the vocational expert testified that the Cashier II position would remain both as the plaintiff performed it and as it is normally performed in the national economy, and the vocational expert further testified that a person with the RFC as found by the ALJ could also perform other work, including the representative occupations of Assembler, *DOT* No. 706.684-022, 1991 WL 679050, and Ticket Taker, *DOT* No. 344.667-010, 1991 WL 672863 (Tr. 85), neither of which require stooping.

aids are medically necessary, and a Cooperative Disability Investigation (CDI) report indicates the claimant was observed to ambulate in public without her aids, despite occasionally using them" (Tr. 30).  "To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed." SSR 96-9p, 1996 WL 374185, at *7.  Here, where the treatment records were devoid of any notation from a treating physician that a cane or wheelchair was medically required, the ALJ properly concluded that the medical evidence did not establish that an assistive device was medically necessary (Tr. 30).  The plaintiff indicated that a doctor did not prescribe her cane (Tr. 93).  While consultative examiner Dr. Schacher's opinion noted "ambulation assistive device – no but needs one" (Tr. 435), his report did not provide the basis for the opinion or explain the circumstances for which it would be necessary, as required by SSR 96-9p (*see* Tr. 435).  Further, as will be discussed below, the ALJ properly discounted Dr. Schacher's opinion, including his notation regarding an assistive device.  Based upon the foregoing, the undersigned finds that the ALJ properly considered the totality of the evidence, including the lack of any treating source evidence regarding the need for an assistive device and the plaintiff's functioning, in making this finding (Tr. 30).

The plaintiff also argues that the ALJ erred in finding that she could stand and/or walk for six hours in an eight-hour day (doc. 17 at 23).   The limitation to standing/walking for six hours was supported by the state agency medical consultants; Drs. Crumlin and Meriwether each opined that the plaintiff could stand and/or walk for six hours in an eight-hour day (Tr. 98, 108, 147, 161). The ALJ found that the medical evidence supported the state agency opinions that the plaintiff could perform work at a light exertional capacity (Tr. 31).  Moreover, the ALJ's standing/walking restrictions were not limited only to the ability to stand/walk and for six hours each in an eight-hour day.   The RFC assessment also included a sit-stand option, which restricted the plaintiff to jobs where she

"needs to alternate sitting or standing positions at thirty-minute intervals throughout the day without leaving the workstation" and avoiding uneven terrain (Tr. 26). The undersigned finds that, contrary to the plaintiff's argument that the ALJ "ignored evidence that failed to support his findings" (doc. 17 at 23), the ALJ properly considered the plaintiff's subjective complaints that she needed to alternate positions and was limited in her ability to sit, stand, and walk (Tr. 29; *see* Tr. 66-67); her daily activities, which included tending to personal care without difficulty, preparing multiple meals per week, doing laundry, vacuuming, and completing household chores, within reason; driving; occasionally going to church; and occasionally shopping in stores, although sometimes with assistance (Tr. 30-31; *see* Tr. 62, 75-76, 80-81, 93, 103); the CDIU's investigatory report that the plaintiff was able to ambulate without an assistive device (Tr. 30; *see* Tr. 456-57); her subjective report that she needed assistance on uneven terrain (Tr. 93); the diagnostic tests, which revealed no significant nerve root impingement (Tr. 30; *see* Tr. 391); the treatment records, which revealed 4/5 (slightly diminished) to 5/5 (full) muscle strength, an antalgic gait, and some straight leg raising tests, but treatment with only medication and occasional injections (Tr. 27-28); and the medical opinions[6], including the state agency opinions that she could perform light work and walk for up to six hours (Tr. 31-32; *see* Tr. 98, 108, 147, 161). Therefore, substantial evidence supports the ALJ's decision to assign the plaintiff a reduced range of light work with a sit-stand option and avoiding uneven terrain.

Based upon the foregoing, this allegation of error is without merit.

### Consultative Examiners' Opinions

The plaintiff further argues that the ALJ failed to properly consider the opinions of Drs. Schacher and Tomarchio, who were both one-time consultative examiners (doc. 17 at 24-28). The regulations require that all medical opinions in a case be

---

[6] The ALJ also noted that no treating physician issued a medical opinion concerning the plaintiff's impairments or any resulting limitations (Tr. 31).

considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The ALJ discussed the examination findings of Drs. Schacher and Tomarchio (Tr. 28) and found that they were entitled to "limited evidentiary weight" (Tr. 31). The ALJ noted that both doctors lacked a longitudinal treatment history with the plaintiff, which limited their insight in her overall condition during the period in question. He further found that the medical evidence supported "some aspects of the consultative examination reports," but the record evidence did not fully support the findings of Drs. Schacher and Tomarchio (Tr. 31). Specifically, the ALJ noted the examiners had "mixed findings" (Tr. 28), which the plaintiff argues was an erroneous conclusion (doc. 17 at 24). The undersigned disagrees.

As noted by the ALJ, at Dr. Schacher's April 2013 examination, the plaintiff could not get on and off the examination table, exhibited an abnormal gait, had range of motion loss in the neck and back, and some weakness in the right lower extremity. However, her strength was otherwise normal, she had no atrophy, and her balance and sensory examinations were normal (Tr. 28; *see* Tr. 431-36). Further, she had full range of motion except for some limitations in lumbar and left knee flexion (Tr. 434). Moreover Dr. Schacher's opinion with respect to the plaintiff's need for an assistive device is inconsistent

34

with the record evidence.  While his opinion noted "ambulation assistive device – no but needs one" (Tr. 435), such a limitation was not supported by the medical evidence.  As discussed above, the ALJ found that assistive devices such as a cane or wheelchair had not been shown to be medically necessary (Tr. 30).  In August 2013, the plaintiff was observed in public ambulating without any aids, and she admitted to being able to perform various daily activities, including preparing meals multiple times per week, doing laundry, vacuuming, and completing household chores (Tr. 29-30; see Tr. 93, 103, 456-57).  Further, although the plaintiff walked with an antalgic gait, no treating source ever indicated that an assistive device was medically required, and the plaintiff admitted that a doctor did not prescribe her cane (Tr. 93, 103).  Moreover, while the form opinion asked Dr. Schacher to "provide findings supporting need," Dr. Schacher failed to do so (Tr. 435).

The ALJ also properly discounted Dr. Tomarchio's August 2013 opinion, which likewise revealed "mixed" findings (Tr. 28) and was inconsistent with the medical evidence (Tr. 31).  As noted by the ALJ, while the plaintiff presented in a wheelchair and stated that "she cannot walk" (Tr. 449-50), she was able to stand next to her wheelchair to perform acuity testing and move from the wheelchair to the examination table (Tr. 448).  She had 5/5 (full) grip strength and appeared to have normal fine and gross manipulative skills (Tr. 449).  She had 2+ pulses without edema, cyanosis, or clubbing and no joint abnormality (Tr. 449, 452).  Her cervical spine range of motion was normal, as was her range of motion in the shoulders, elbows, wrists, hip, and ankle.  While her lumbar flexion was limited to 45 degrees, her extension and lateral flexion appeared to be normal.  While she had a positive straight leg raising tests in supine position, straight leg raising in the seated position was normal.  The plaintiff's muscle strength was 5/5 (full) in the upper and lower extremities, except for 3/5 distal and proximal muscle strength in the right lower extremity (Tr. 449).  Despite her slightly diminished right leg strength, she had no atrophy (Tr. 452).  Sensation was intact, and her spine showed no evidence of deformity and was nontender to palpation.

35

Dr. Tomarchio noted that the plaintiff was "somewhat reliable" (Tr. 447) and further noted that, "if her presentation is genuine," he believed she would have difficulty standing for prolonged periods, walking long distances, or carrying or lifting heavy objects (Tr. 449). As discussed above, the ALJ relied on substantial evidence in finding that the plaintiff's subjective allegations were not fully credible, noting the inconsistency between the plaintiff's claim that she relied on a wheelchair and the CDIU report from just three weeks after Dr. Tomarchio's examination in which the plaintiff was observed walking without an assistive device, carrying two bags of items and a large purse, and bending at the waist to place a 12 pack of beer on the floor (Tr. 30; *see* Tr. 456-57). Further, no treating physician indicated that the plaintiff required a cane or wheelchair. Contemporaneous treatment records from April and June 2013 likewise revealed that her "symptoms are fairly controlled" (Tr. 443), and that she had no changes in her sciatica (Tr. 443). Although Dr. Tomarchio found 3/5 strength in the distal and proximal muscles of the right lower leg, no other examiner ever found less than 4/5 strength (slightly diminished) (Tr. 395-97, 399-409, 412, 414, 427, 435, 486, 490, 493). The plaintiff notes that the October 2012 MRI showed disc dissection and narrowing, but, as noted by the ALJ, it also revealed no significant stenosis or nerve root impingement (doc. 17 at 27; Tr. 30; *see* Tr. 391).

As argued by the Commissioner, despite affording Drs. Schacher and Tomarchio's opinions limited weight, the ALJ assessed a generous RFC, limiting the plaintiff to light work; lifting or carrying 20 pounds frequently and ten pounds occasionally; standing or walking and sitting for six hours each in an eight-hour day; with the need to alternate sitting and standing at 30 minutes through the day; with no foot control operation of the left leg; no more than occasional climbing of ramps or stairs, balance, stooping, crouching, or kneeling; no climbing or ladders, ropes or scaffolds or crawling; avoiding concentrated exposure to vibration, hazardous machinery, and unprotected heights; and avoiding uneven terrain (Tr. 26). Although the opinions of Drs. Tomarchio and Schacher were given only

36

limited weight, the ALJ clearly considered them in crafting the RFC.  Based upon the foregoing, the undersigned finds that the ALJ's evaluation of the consultative examiners' opinions is supported by substantial evidence and is without legal error.

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

October 25, 2016
Greenville, South Carolina